IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| CARILION CLINIC, et al, | ) | |
|     Plaintiffs, | ) | |
| | ) | Case No. 7:21-cv-00168 |
| v. | ) | |
| | ) | |
| AMERICAN GUARANTEE & | ) | |
| LIABILITY INSURANCE CO., | ) | By:   Michael F. Urbanski |
|     Defendant. | ) | Chief United States District Judge |

## MEMORANDUM OPINION

This insurance coverage suit brought by Carilion Clinic and many of its affiliated entities (collectively "Carilion Clinic") is before the court on defendant American Guarantee & Liability Company's ("AGLIC") Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1). ECF No. 47. The issues have been fully briefed and a hearing was held in this matter on October 19, 2021. The court concludes that The Zurich EDGE Healthcare Policy ("Zurich EDGE Policy") at issue does not provide property damage or time element (business interruption) coverage for Carilion Clinic's claims arising out of the COVID-19 pandemic, and that a claim for property damage based on the SARS-CoV-2 virus is excluded under the unambiguous terms of the Zurich EDGE Policy. As such, AGLIC's Motion to Dismiss will be **GRANTED** as to Carilion Clinic's claims for property damage and time element coverage. At the same time, the court concludes that Carilion Clinic's claim for Interruption By Communicable Disease coverage is ripe, and **DENIES** AGLIC's Motion to Dismiss the claim for Interruption By Communicable Disease coverage. Accordingly, AGLIC's Motion to Dismiss is **GRANTED in PART** and **DENIED in PART**.

1

## I.

Carilion Clinic, based in Roanoke, is the largest health system in Virginia's Blue Ridge

and Southwest regions. Carilion Clinic operates seven hospitals and employs over 13,000

people, including 1,000 physicians and over 300 acute care providers, providing care in over

80 specialties, at over 270 ambulatory care and related healthcare facilities. First Am. Compl.,

ECF No. 43, at ¶ 23. Carilion Clinic alleges physical loss of or damage to its covered property

as follows:

> The Coronavirus can be released into the air when infected
> persons breathe, talk, cough, sneeze or sing, and such releases can
> infiltrate ventilation systems, as well as myriad surfaces (i.e.,
> fomites[1]) such as dermal contact surfaces (e.g. door handles,
> bedsheets, hospital gowns, bed railings, and medical equipment).
> The Coronavirus has and continues to deposit, and therefore
> elevate contagion risks on, myriad dermal contact surfaces, which
> are transformed into disease-spreading fomites. These fomites
> can pose transmission risks for persons contacting those surfaces.

First Am. Compl., ECF No. 43, at ¶ 12. The First Amended Complaint rejects the comparison

of the coronavirus to dust, characterizing it as a "false pronouncement[ ] advanced by the

insurance industry."

> [T]he presence of the Coronavirus in Carilion Clinic's property in
> the air and on surfaces was neither expected nor ordinary. Unlike
> dust, the Coronavirus cannot be removed easily from surfaces,
> e.g., simply by routine cleaning of the surfaces. Attempting to
> remove the Coronavirus from surfaces requires specific
> protocols. These specific protocols require harsh and abrasive
> chemicals that are not routinely used and that themselves cause
> additional physical loss of or damage to property. Even assuming
> surface cleaning was 100% effective every time – it is not – that

---

[1] The online Oxford English Dictionary defines fomite as "[s]omething that is capable of transferring a disease from one place or individual to another; spec. an object or substance that is contaminated with an infectious agent and capable of transmitting it by direct contact." Fomite, Oxford English Dictionary, www.oed.com (last visited Feb. 3, 2022).

does not eliminate the Coronavirus from the air, which is the
number one transmission vector.

Id. at ¶ 16.

The First Amended Complaint alleges that Carilion Clinic experienced direct
physical loss of or damage to its property in at least four ways: (1) positive COVID-19 tests
for its employees and patients "demonstrate[ ] both the certain or virtually certain presence of
COVID-19 and/or the Coronavirus throughout its network of hospitals, primary and specialty
physician practices and other complementary services, and its Wellness Centers, in the air and
on surfaces (whether in droplet nuclei, aerosols, droplets or otherwise);" (2) governmental
orders caused the loss of normal use and function of its property (in either total or part); (3)
modification of "physical behaviors through the use of social distancing, avoiding confined
indoor spaces, and avoiding congregating in the same physical area as others, in order to reduce
or minimize the potential for viral transmission;" and (4) the need to mitigate the threat or
actual physical presence of the Coronavirus on "surfaces, in heating and air conditioning
systems, and in or on any of the multitude of other places the Coronavirus has been or could
be found." Id. at ¶ 27.

The First Amended Complaint alleges that the "presence of Coronavirus in the air and
on surfaces made Carilion Clinic's Facilities uninhabitable, unsafe, and unfit for their normal
and intended uses," and "no amount of routine surface cleaning could remove the aerosolized
Coronavirus suspended in the air in Carilion Clinic's Facilities, further rendering those
Facilities unfit for their intended uses. As a result, the Carilion Clinic Facilities had to operate
at a limited capacity or close entirely." Id. at ¶¶ 33–34. The First Amended Complaint alleges
that Carilion Clinic suspended all elective medical procedures during March–May, 2020, closed

its Wellness Centers entirely during March–June, 2020, and incurred massive expenses associated with its "herculean" efforts to help minimize exposure risk and make its facilities as safe as possible. Id. at ¶¶ 35–37.

Carilion Clinic alleges that "[t]o cushion the impact of the Coronavirus and COVID-19, Carilion Clinic turned to its property insurer, AGLIC, to whom Carilion Clinic has paid nearly $1 million in premiums in exchange for $1.3 billion in property damage and time element (also known as business interruption) coverage for the June 1, 2019 to June 1, 2020 policy period alone." Id. at ¶ 42. In its remaining 245 paragraphs, the First Amended Complaint provides detailed support for Carilion Clinic's claims with reference to medical studies, epidemiological data, and guidance published by the scientific community, including the Centers for Disease Control and Prevention ("CDC") and World Health Organization ("WHO").

AGLIC has denied coverage under the all-risk policy[2] purchased by Carilion Clinic, asserting that Carilion Clinic's business losses from the COVID-19 pandemic do not stem from "direct physical loss of or damage caused by a Covered Cause of Loss to Covered Property," Zurich EDGE Policy, ECF No. 43-1, § 1.01., and that the policy excludes claims arising from "any condition of property due to the actual presence of any . . . virus . . . ." Id. § 7.09. AGLIC also contends that Carilion Clinic's claim for coverage for Interruption By Communicable Disease, id. at § 5.02.35., is not ripe for adjudication as AGLIC is awaiting

---

[2] The all-risk policy in this case provides "coverage for direct physical damage to or loss of property resulting from any cause that it not excluded by the Policy." NTT Data Int'l LLC v. Zurich Am. Ins. Co., No. 3:21-CV-890-S, 2022 WL 196533, at *5 (N.D. Tex. Jan. 21, 2022) (referencing same Zurich EDGE policy at issue here); Ins. Co. of N. Am. v. U.S. Gypsum Co., 678 F. Supp. 138, 139 (W.D. Va. 1988) (stating that an all-risk policy "insures all risks of loss except for specifically excluded events. . .").

claims data requested from Carilion Clinic. The court will address the three aspects of AGLIC's motion–coverage, exclusion, and ripeness–in turn.

## II.

### A. Rule 12(b)(1).

A party may move to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). A defendant can challenge subject matter jurisdiction in two ways: facially or factually. Beck v. McDonald, 848 F.3d 262, 270 (4th Cir. 2017).

A facial challenge asserts "that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based." Id. (quoting Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982)). When a defendant makes a facial challenge to the court's jurisdiction, the plaintiff is "'afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration.'" Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009) (quoting Bain, 697 F.3d at 1219). In other words, the court assumes the truth of the facts alleged and asks if those facts make plausible the conclusion that the court has jurisdiction. See id. at 193; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).

Conversely, when a defendant challenges the factual basis of plaintiff's jurisdictional allegations, "the trial court may go beyond the complaint, conduct evidentiary proceedings, and resolve the disputed jurisdictional facts." Kerns, 585 F.3d at 193. In such situations, the facts of the plaintiff's jurisdictional allegations are not assumed true, the burden of proof is on the plaintiff, and the court may weigh evidence outside the pleadings, such as testimony and affidavits, to determine whether it has jurisdiction. Adams, 697 F.2d at 1219.

### B.     Rule 12(b)(6).

Under Rule 12(b)(6), a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. At this stage, the court must accept as true all well-pleaded allegations and draw all reasonable factual inferences in the plaintiff's favor. Erickson v. Pardus, 551 U.S. 89, 94 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (internal citation and quotation marks omitted). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).

### III.

AGLIC's principal argument is that its all-risk insurance policy covers direct physical loss of or damage to property, and that the COVID-19 pandemic has not caused such harm. Carilion Clinic contends that it has alleged such harm, asserting that the presence of the virus in its facilities on surfaces and in the air causes direct physical loss of and damage to its property. "Accordingly, the presence of the Coronavirus in and on property, including in indoor air, on surfaces, and on objects, causes direct physical loss of or damage to property by causing physical harm to and altering property and otherwise making it incapable of being used for its intended purpose." First Am. Compl., ECF No. 43, at ¶ 97.

Section 1.01 of the Zurich EDGE Policy, titled "Insuring Agreement," provides "[t]his Policy Insures against direct physical loss of or damage caused by a Covered Cause of Loss to

Covered Property . . . subject to the terms, conditions and exclusions stated in this Policy." Zurich EDGE Policy, ECF No. 43-1, § 1.01. Covered Cause of Loss is defined as "[a]ll risks of direct physical loss of or damage from any cause unless excluded." Id. at § 7.11. Coverage for business interruption claims, referred to under the Zurich EDGE Policy as Time Element Coverage, also is cabined by "the time of physical loss or damage of the type insured against." Id. at § 4.03.01.01. Thus, the issue of physical loss or damage applies to Carilion Clinic's claims for both property damage and time element coverage.

## A. Physical Loss or Damage — National Precedent.

The issue of insurance coverage for physical loss or damage in the context of the COVID-19 pandemic is being debated and decided by courts throughout the country in thousands of federal and state cases. Eight federal circuit courts of appeals have considered this issue over the past six months, and in all of these cases the federal appellate courts have concluded that property insurance policies providing coverage for direct physical loss of or damage to property do not cover property damage and business interruption losses stemming from the SARS-CoV-2 virus and the COVID-19 pandemic. While none of these eight federal appellate decisions involved the Zurich EDGE Policy at issue here, each addressed whether the SARS-CoV-2 virus and the COVID-19 pandemic caused various businesses direct physical loss of or damage to property under the terms of similar commercial property insurance policies.

In Oral Surgeons, P.C., v. Cincinnati Ins. Co., 2 F. 4th 1141 (8th Cir. 2021), an oral surgery clinic stopped performing non-emergency procedures pursuant to an order from the Iowa governor and sought recovery under a policy of insurance for financial losses due to

surgical procedures it could not perform because it was unable to fully use its offices. Id. at 1143. The insurance policy in question provided coverage for business interruption caused by accidental physical loss or accidental damage to property, which the Eighth Circuit regarded as requiring "some physicality to the loss or damage of property—e.g., a physical alteration, physical contamination, or physical destruction." Id. at 1144. Because the oral surgery clinic did not allege any physical alteration of the property, but rather alleged that its suspension of non-emergency procedures stemmed from the pandemic and government-imposed restrictions, the Eighth Circuit concluded that its claim did not involve physical loss or physical damage to property and was not covered under the property damage policy. Id. at 1145.

The Eleventh and Seventh Circuits reached the same result in two other cases in which dental practices sought to recoup losses from their commercial property insurers stemming from the COVID-19 pandemic. In Gilreath Fam. & Cosm. Dentistry, Inc. v. Cincinnati Ins. Co., No. 21-11046, 2021 WL 3870697 (11th Cir. Aug. 31, 2021), the Eleventh Circuit affirmed the district court's dismissal of a complaint for insurance coverage for losses due to the COVID-19 pandemic. As in Oral Surgeons, Gilreath postponed routine and elective dental procedures in response to the Georgia governor's shelter-in-place order and federal guidance and sought coverage for physical loss or damage. Id. at *1. The Eleventh Circuit disagreed, noting that under Georgia law the common meaning of direct physical loss or damage means there "must be an actual change in insured property that either makes the property unsatisfactory for future use or requires that repairs be made." Id. at *2 (internal citation and quotation omitted). In so doing, the court rejected Gilreath's argument that virus particles present in its enclosed office made dental practice problematic, concluding that "we do not

8

see how the presence of those particles would cause physical damage or loss to the property."
Id.[3]

Likewise, in Sandy Point Dental, P.C., v. Cincinnati Insurance Co., 20 F.4th 327 (7th
Cir. 2021), the Seventh Circuit affirmed the dismissal of COVID-19 commercial property
insurance claims brought by a dental practice and restaurants. Applying Illinois law, the
Seventh Circuit read the direct physical loss provision in the policies to require physical
alteration of the property. Id. at 333. The court found the policy's provision of coverage for
losses sustained during a period of restoration in which the property is repaired, rebuilt or
replaced to be a "textual clue[ ] that reinforce[s] the conclusion that 'direct physical loss'
requires a physical alteration to property. . . . Without a physical alteration to property, there
would be nothing to repair, rebuild, or replace." Id. at 333. The Seventh Circuit distinguished
cases in which gas infiltrated premises, reasoning that in such circumstances, the gas
contamination made the premises uninhabitable. Id. at 334. "That distinguishes these cases
from the three that are now before us, where—at most—the Businesses' preferred use of the
premises was partially limited, while other uses remained possible." Id. The court found the
dental practice's argument that the pandemic caused a loss of the intended use of the property
insufficient under the terms of the policy.

> As we have explained, this is not enough. Sandy Point may have
> been unable to put its property to its preferred (and, we assume,
> its most lucrative) use. But this is a far cry from the complete
> physical dispossession of property suffered by the policyholders

---

[3] Outside of the context of a dental practice, the Eleventh Circuit has held that "[t]he danger of COVID-19,
however real, does not expand the scope of the all-risks policy. The district court correctly explained that
'direct physical loss or damage requires an actual physical change to property that COIVD-19 particles cannot
cause' because a contaminated location can be immediately restored to its previous state by cleaning and
disinfecting—no repair or replacement required." Ascent Hosp. Mgmt. Co., LLC v. Emps. Ins. of Wausau,
No. 21-11924, 2022 WL 30722 (11th Cir. Jan. 14, 2022).

> in the gas-infiltration cases. Sandy Point at all times remained able to perform *some* dental work, and nothing precluded it from using the property for some other non-dental purpose consistent with the closure orders.

Id. at 335. Finally, the dental practice sought leave to amend its complaint to add an allegation, mirroring the one asserted by Carilion Clinic here, that "COVID-19 physically attaches itself to the physical premises, and thereby deprive[s] plaintiff of the use of such premises. It supported this contention with allegations regarding how the SARS-CoV-2 virus is transmitted by air and surfaces through water droplets, aerosols, and fomites." Id. (internal quotation omitted). The Seventh Circuit was unpersuaded.

> But these allegations do not cure the deficiencies of the first amended complaint. Even if the virus was present *and* physically attached itself to Sandy Point's premises, Sandy Point does not allege that the virus *altered* the physical structures to which it attached, and there is no reason to think that it could have done so. While the impact of the virus on the world over the last year and a half can hardly be overstated, its impact on physical property is inconsequential: deadly or not, it may be wiped off surfaces using ordinary cleaning materials, and it disintegrates on its own in a matter of days. We thus find no reversible error in the district court's denial of Sandy Point's motion for leave to amend its complaint.

Id. Last month, the Sixth Circuit decided another dental practice case, this time under Kentucky law, holding that the losses sustained by the practice as a result of the COVID-19 pandemic did not qualify as direct physical loss under the practice's commercial property insurance policy. Estes v. Cincinnati Ins. Co., No. 21-5587, 2022 WL 108606, at *3 (6th Cir. Jan. 12, 2022). ("Estes does not request a dime of payment for property losses (whether to its office buildings or the items within those buildings). Rather, Estes seeks only the income it

lost and the expenses it incurred as a result of COVID-19 and the government restrictions. But Estes bought a *property* insurance policy, not a *profit* insurance policy.").

AGLIC urges reliance on the decision of the Sixth Circuit in Santo's Italian Café LLC v. Acuity Ins. Co., 15 F.4th 398 (6th Cir. 2021), in which the court rejected a restaurant's claim that the loss of use of its property due to a government shutdown order constituted a direct physical loss or damage to property under an all-risk insurance policy. "All in all, the cause of the suspension of operations—the prohibition on in-person dining—did not arise from a physical loss of property or physical damage to it." Id. at 402. The court observed that this conclusion was reinforced by the fact that the period of business interruption covered under the policy ended when the insured property was repaired, rebuilt or replaced. Id. at 403.

> But what would that mean under Santo's Café's interpretation of the policy? It has not alleged any problem with the building. There is nothing to repair, rebuild, or replace that would allow the resumption of in-person dining operations. What the restaurant needed was an end to the ban on in-person dining, not the repair, rebuilding, or replacement of any of its property.

Id. The Sixth Circuit disagreed with the restaurant owner that the policy was ambiguous, determining that the policy referred to "direct physical loss of property, not the inability to use property." Id. at 405. The court recognized that "Ohio's prohibition on indoor dining no doubt caused an economic loss for Santo's Café. But it did not cause a direct, physical loss of property, which is a precondition for the business suspension coverage in the policy and in fact for most coverage in the policy." Id. at 404. At the end of the day, the court noted that a "loss of use simply is not the same as a physical loss." Id. at 402.

In two other COVID-19 restaurant cases, Mudpie, Inc., v. Travelers Cas. Ins. Co., 15 F.4th 885 (9th Cir. 2021), and Terry Black's Barbeque, L.L.C., v. State Auto. Mut. Ins. Co., 22

F.4th 450 (5th Cir. 2022), the Ninth and Fifth Circuits affirmed dismissal of similar claims, finding no covered direct physical loss or damage to property resulting from closure orders occasioned by the COVID-19 pandemic. In <u>Mudpie</u>, the Ninth Circuit held that an insurance claim for direct physical loss of or damage to property in California required physical alteration of the property. 15 F.4th at 892. Applying Texas law, the Fifth Circuit in <u>Terry Black's</u> <u>Barbeque</u> affirmed dismissal of a COVID-19 claim under an all-risk commercial property insurance policy, concluding that the restaurant "failed to allege any tangible alteration or deprivation of its property." 22 F.4th at 458. <u>See</u> <u>Aggie Invs. LLC v. Contl Cas. Co.</u>, No. 21-40382, 2022 WL 257439, at *3 (5th Cir. Jan. 26, 2022) ("'[D]irect physical loss of property' unambiguously requires a tangible alteration or deprivation of property.).

In late December 2021, the Tenth and Second Circuits weighed in, consistently declining to find coverage under property insurance policies for businesses suffering COVID-19 related losses, in each case concluding that direct physical loss of or physical damage to property did not include loss of use of insured business premises due to pandemic closure orders. <u>Goodwill Indus. of Cent. Okla., Inc. v. Phila. Indem. Ins. Co.</u>, No. 21-6045, 2021 WL 6048858, at *3 (10th Cir. December 21, 2021) ("The Business Income provision unambiguously covered only losses stemming from physical alteration or tangible dispossession of property."); <u>10012 Holdings, Inc. v. Sentinel Ins. Co.</u>, 21 F.4th 216, 222 (2nd Cir. 2021) ("[T]hose terms instead require actual physical loss of or damage to the insured's property. We therefore reject 10012 Holdings's argument that 'physical loss' must mean 'loss of physical possession and/or direct physical deprivation' — in other words, loss of use."). Last week, the Second Circuit reached the same conclusion in <u>Kim-Chee LLC v. Phila. Indem.</u>

Ins. Co., No. 21-1082-cv, 2022 WL 258569, at *2 (2nd Cir. Jan. 28, 2022) ("Even assuming the virus's presence at Kim-Chee's tae-kwon-do studio, the complaint does not allege that any part of its building or anything within it was damaged—let alone to the point of repair, replacement, or total loss. Nor does Kim-Chee explain how, other than by the denial of access, any of its property could no longer serve its insured function.").

Carilion Clinic argues that these decisions are distinguishable as the complaints in some of those cases did not allege the presence of the SARS-CoV-2 virus on the covered premises or make detailed allegations of direct physical harm caused to its facilities by coronavirus-laced fomites and air. For example, in Santo's, the Sixth Circuit noted that "[n]o one argues that the virus physically and directly altered the property." Santo's, 15 F.4th at 402. Accordingly, Carilion Clinic argues that the determination of direct physical harm cannot be resolved on the pleadings and requires factual development.

Two federal district courts, considering such allegations in the context of the very same Zurich EDGE policy at issue here, have done just that, denying motions to dismiss in favor of additional factual development. In Novant Health Inc. v. Am. Guarantee and Liab. Ins. Co., No. 1:21-CV-309, 2021 WL 4340006 (M.D. N.C. Sept. 23, 2021), plaintiff hospital system alleged that the SARS-CoV-2 exists and is spread by human beings into the air and on surfaces which "results in tangible physical transformation of the air and surfaces, rendering them dangerous transmission vehicles for the disease." Id. at *2 (internal quotations omitted). Just as Carilion Clinic does here, Novant alleges that the impact and physical damage caused by the presence of the virus is not temporary and is not fully remediated by routine cleaning and disinfection alone. "Because of the nature of its health care operations, the presence of the

COVID-19 virus on Novant's real and personal property causes a tangible alteration to that property that can change the property, including air and the surfaces so that the property is unsafe, unfit and uninhabitable for ordinary functional use." Id. at *2. Based on these allegations, the district court denied AGLIC's motion to dismiss in Novant, concluding as follows: "Whether COVID-19 has resulted in direct physical damage or loss to Novant, and if so to what extent, are questions better evaluated on a developed factual record. Novant has adequately alleged direct physical damage or loss, and dismissal on this basis is inappropriate at the Rule 12(b)(6) stage." Id. at *3 (citing Elegant Massage, LLC v. State Farm Mut. Auto. Ins., 506 F. Supp. 3d 360, 372–76 (E.D. Va. 2020)).

In AECOM v. Zurich Am. Ins. Co., No. LA CV21-00237 JAK, 2021 WL 6425546 (C.D. Cal. Dec. 1, 2021), the court found that the pleadings sufficiently alleged coverage under a Zurich EDGE policy for pandemic related losses, concluding that the complaint "sufficiently alleges that respiratory droplets, which transmit COVID-19, are physical objects that may attach to surfaces and alter the property. Accepting the allegations in the Complaint as true, it cannot be determined as a matter of law that the presence of COVID-19 in Plaintiff's properties could not cause a 'direct loss of or damage to property.'" Id. at *8. Both Carilion Clinic and AGLIC have provided the court with rulings by other trial courts on motions to dismiss COVID-19 related claims on Zurich commercial property policies. See ECF Nos. 70-1, 75, 78, 84, 88, 94, 100, 101, 102, and 103. The majority of the decisions favor AGLIC's position.

There are many opinions addressing the direct physical loss issue, and the court considers several of them to be noteworthy in that they concern claims by healthcare systems

similar to Carilion Clinic. First, there is the Novant case discussed above denying AGLIC's motion to dismiss. On the other hand, in Palomar Health v. AGLIC, No. 3:21-cv-0490, 2021 WL 4035005 (S.D. Cal. Sept. 3, 2021), the Southern District of California reached the opposite conclusion in a case brought by a healthcare system under the same Zurich EDGE Healthcare Policy at issue here. The district court found that "the presence of the SARS-COV-2 virus and COVID-19 patients does not constitute direct physical loss of or damage to Palomar's property." Id. at *9. Applying California law, the court concluded that "[t]he presence of the SARS-COV-2 virus on the covered property cannot realistically be viewed as a risk to the physical integrity of the structures." Id. at *8. Consistently, the Bergen County, New Jersey Superior Court dismissed a COVID-19 claim brought by a health system under the Zurich EDGE policy, finding no physical loss of or damage to property. Valley Health Sys., Inc. v. Zurich Am. Ins. Co., No. BER-L-19070-21, 2021 WL 4958349 (N.J. Super. L. Oct. 18, 2021). The court reasoned:

> The main factor for analysis is the requirement that, for the presence of a contaminant to constitute a direct physical loss of or damage to property, the substance must permeate the premises to distinctly and demonstrably compromise its physical integrity or render it entirely unhabitable for a distinct period of time. This threshold has not been met here. The government orders are what caused Plaintiffs to be unable to fully use their properties, however, it was not because of any physical casualty to the property itself. Thus, as a matter of law, the claim that a harmful substance is present is insufficient to establish direct physical loss of or damage to property.

Id. at *5.

The Southern District of New York reached the same conclusion, albeit on an all-risk commercial property insurance policy issued by Lexington Insurance Company, rather than

AGLIC. <u>Northwell Health, Inc. v. Lexington Ins. Co.</u>, No. 21-cv-1104, 2021 WL 3139991 (S.D. N.Y. July 26, 2021). In <u>Northwell Health</u>, the health system alleged, as Carilion Clinic does here, that "respiratory droplets carrying the coronavirus attach to surfaces, linger there, and thus compromise the physical integrity of the structures it permeates and renders those structures unusable." <u>Id.</u> at *5 (internal quotation and punctuation omitted). The court noted that "the Complaint does not allege any facts supporting the conclusion that the coronavirus compromises the physical integrity of objects by harming surfaces and structures, as opposed to harming the people who touch them." <u>Id.</u> The court noted that "Northwell argues that when a physical substance permeates a property and renders the property unusable for its intended purpose, that substance causes direct physical loss or damage. Respiratory droplets carrying SARS-CoV-2, Northwell reasons, are like the invisible fumes or noxious gas that courts have held can constitute a form of physical damage." <u>Id.</u> The court found Northwell's argument flawed in three respects.

> First, Northwell's preferred interpretation risks impermissibly collapsing coverage for direct physical loss or damage into "loss of use" coverage. Second, the coronavirus – unlike invisible fumes and chemicals – does not "persist" and irreversibly alter the physical condition of a property. As the Complaint itself suggests, a property may be kept "safe and sanitized," and therefore usable, despite the presence of SARS-CoV-2. Third, even accepting Northwell's definition of "direct physical loss or damage" to include any physical substance or force that makes a property unusable, Northwell had not plausibly alleged that the presence of COVID-19 made its properties unusable. Northwell's hospitals continued to operate with "extra precaution"; their functions were not destroyed, nor were they declared unsafe to enter.

<u>Id.</u> at *6 (internal citations omitted).

In the past three weeks, two other federal district courts have dismissed COVID-19 claims brought by health care systems. Olmsted Med. Ctr. v. Cont'l Cas. Co., No. 21-1309 (MJD/BRT), 2022 WL 126336, at *7 (D. Minn. Jan. 13, 2022) ("Olmsted's claim of physical loss or damage based on persons testing positive for COVID-19 or the presence of the virus in its buildings fails."); Conn. Child.'s Med. Ctr. v. Cont'l Cas. Co., No. 3:21-cv-291 (JAM), 2022 WL 168786, at *6 (D. Conn. Jan. 19, 2022)("In short, whether the theory is based on 'loss of use' of property or based on 'physical damage' from the COVID-19 virus itself, the result is the same: there is no 'direct physical loss or damage' to property.").

## B. Physical Loss or Damage — Virginia Precedent.

Carilion Clinic urges the court "not to follow the herd" of decisions from around the country declining to find coverage for direct physical loss stemming from the SARS-CoV-2 virus, but to decide the case based on the allegations in the First Amended Complaint and the provisions of the Zurich EDGE policy. And, of course, as this host of decisions makes clear, the court must be guided by Virginia law governing the interpretation and construction of insurance policies.

Under Virginia law governing this dispute, the interpretation of insurance policies presents a question of law. See Nationwide Mut. Fire Ins. Co. v. Erie Ins. Exch., 293 Va. 331, 336, 798 S.E.2d 170, 173 (2017); Dragas Mgmt. Corp. v. Hanover Ins. Co., 798 F. Supp. 2d 766, 772 (E.D. Va. 2011) (citation omitted). "Courts interpret insurance policies, like other contracts, in accordance with the intention of the parties gleaned from the words" used in the policy. Seals v. Erie Ins. Exch., 277 Va. 558, 562, 674 S.E.2d 860, 862 (2009) (quoting Floyd v. N. Neck Ins. Co., 245 Va. 153, 158, 427 S.E.2d 193, 196 (1993)). As such, "when the

language in an insurance policy is clear and unambiguous, courts . . . give the language its plain and ordinary meaning and enforce the policy as written." Selective Way Ins. Co. v. Crawl Space Door Sys., Inc., 162 F. Supp. 3d 547, 551 (E.D. Va. 2016) (quoting Day v. Mount Vernon Fire Ins. Co., No. 1:12cv669, 2013 WL 314827 (E.D. Va. Jan. 23, 2013). In so doing, courts "must adhere to the terms of a contract of insurance as written, if they are plain and clear and not in violation of law or inconsistent with public policy." Blue Cross & Blue Shield v. Keller, 248 Va. 618, 626, 450 S.E.2d 136, 140 (1994). In interpreting an insurance policy, a court cannot "make a new contract for the parties different from that plainly intended and thus create a liability not assumed by the insurer." Id. (quoting Pilot Life Ins. Co. v. Crosswhite, 206 Va. 558, 561, 145 S.E.2d 143, 146 (1965)).

Insurance policies, like other contracts, "are to be read as a whole, and meaning is to be given to all provisions, if possible, in order to determine the intent of the parties." State Farm Fire & Cas. Co. v. Nationwide Mut. Ins. Co., 596 F. Supp.2d 940, 946 (E.D. Va. 2009). "The various provisions are harmonized, giving effect to each when reasonably possible, and are construed considering the circumstances under which they were executed and the condition of the parties." Schuiling v. Harris, 286 Va. 187, 193, 747 S.E.2d 833, 836 (2013). When a term is undefined, courts may consider the context of the policy in order to assess the plain meaning of the text. Schwartz & Schwartz of Va., LLC v. Certain Underwriters at Lloyd's, 677 F. Supp.2d 890, 905 (W.D. Va. 2009) (citing CACI Int'l, Inc., v. State Farm Fire & Marine Ins. Co., 566 F.3d 150, 158 (4th Cir. 2009)).

"Because insurance companies typically draft their policies without the input of the insured, the companies bear the burden of making their contracts clear." Res. Bankshares

Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 636 (4th Cir. 2005). "Accordingly, if an ambiguity exists, 'on the face of the policy,' Granite State Ins. Co. v. Bottoms, 243 Va. 228, 233, 415 S.E.2d 131, 134 (1992), "it must be construed against the insurer." Res. Bankshares Corp., 407 F.3d at 636. "It is a well recognized rule that insurance policies, in case of doubt, should be construed most strongly against the insurer. But this does not authorize the court to make a new contract for the parties, nor to adopt a construction not justified by the language or intent of the parties." Ocean Accident & Guar. Corp. v. Washington Brick & Terra Cotta Co., 148 Va. 829, 844, 139 S.E. 513, 517 (1927). "A policy provision is ambiguous when, in context, it is capable of more than one reasonable meaning." Res. Bankshares Corp., 407 F.3d at 636. "In determining whether the provisions are ambiguous, we give words employed their usual, ordinary, and popular meaning." Nextel Wip Lease Corp. v. Saunders, 276 Va. 509, 516, 666 S.E.2d 317, 321 (2008). "[C]ourts must not strain to find ambiguities," Res. Bankshares Corp., 407 F.3d at 636, and "provisions are not ambiguous merely because the parties disagree about their meaning." Nextel Wip, 276 Va. at 516, 666 S.E.2d at 321.

　Generally, policyholders bear the burden of proving that the claim is covered by the insurance policy. Res. Bankshares Corp., 407 F.3d at 636. "Where an insured has shown that his loss occurred while the insurance policy was in force, but the insurer relies upon exclusionary language in the policy as a defense, the burden is upon the insurer to prove that the exclusion applies to the facts of the case." Bituminous Cas. Corp. v. Sheets, 239 Va. 332, 336, 389 S.E.2d 696, 698 (1990); see also Am. Reliance Ins. Co. v. Mitchell, 238 Va. 543, 547, 385 S.E.2d 583, 585 (1989) ("Exclusionary language in an insurance policy will be construed

most strongly against the insurer and the burden is upon the insurer to prove that an exclusion applies.").

In a few cases, Virginia courts have addressed whether commercial property insurance policies cover claims for business losses arising from the COVID-19 pandemic. In <u>Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.</u>, 506 F. Supp.3d 360 (E.D. Va. 2020), the Eastern District of Virginia denied State Farm's motion to dismiss a health spa's claim under an all-risk insurance policy for losses suffered during the pandemic. As to coverage, the court found "that the phrase 'direct physical loss' has been subject to a spectrum of interpretations in Virginia on a case-by-case basis, ranging from direct tangible destruction of the covered property to impacts from intangible noxious gasses or toxic air particles that make the property uninhabitable or dangerous to use." <u>Id.</u> at 373. Although the presence of the virus posed no structural form of direct physical loss, the court found it "plausible that a fortuitous 'direct physical loss' could mean that the property is unhabitable, inaccessible, or dangerous to use because of intangible, or non-structural, sources." <u>Id.</u> at 376. The court reasoned:

> Here, while the Light Stream Spa was not structurally damaged, it is plausible that Plaintiffs experienced a direct physical loss when the property was deemed unhabitable, inaccessible, and dangerous to use by the Executive Orders because of its high risk for spreading COVID-19, an invisible but highly lethal virus. That is, the facts of this case are similar [to] those where courts found that asbestos, ammonia, odor from methamphetamine lab, or toxic gasses from drywall, which caused properties [to be] uninhabitable, inaccessible, and dangerous to use, constituted a direct physical loss.

<u>Id.</u> While the <u>Elegant Massage</u> court found the losses in these cases to be similar to the alleged loss from the COVID-19 mandated shutdown, it did "not go as far as to interpret 'direct

physical loss' to mean whenever 'property cannot be used for its intended purpose' due to intangible sources." Id. at 375 (citing Pentair v. AGLIC, 400 F.3d 613, 616 (8th Cir. 2005)).

The Elegant Massage court declined as well to apply an exclusion for "[v]irus, bacteria or other microorganism that induces or is capable of inducing physical distress, illness or disease" for two reasons. Id. at 371. First, the court was concerned that the exclusion contained an "expansive anti-concurrent causation clause [that] is not a recognized or settled doctrine in the Court's jurisdiction." Id. at 378. Next, the court found that the virus exclusion did not bar the spa's claim because the spa "is neither alleging that there is a presence of a virus at the covered property nor that a virus is the direct cause of the property's physical loss." Id. at 379. Nor did the spa allege that the governor's shutdown order came as a result of virus contamination on its covered property. Id. Rather, the spa alleged that the sole cause of its loss of business income was the government shutdown order which shuttered it as a preventative health measure. Id. As the spa did not allege that the presence of the virus on its property caused the shutdown of its business, the court found the insurer failed to meet its burden to show the virus exclusion applied. Id.

In four other cases, the Eastern District of Virginia has gone the other way and applied virus exclusion clauses in insurance policies to bar business losses resulting from the pandemic. Barroso, Inc. v. Twin City Fire Ins. Co., Civ. A. No. 1:20-cv-00632-LMB-MSN (E.D. Va. Nov. 10, 2020);[4] ECF 48-3, at 16;  L&L Logistics and Warehousing Inc., v. Evanston Ins. Co., 533

---

[4] The court stated: "[T]he overwhelming authority supports the defendant's position, that under the specific language of this insurance contract and in particular the very, in my view, clear exclusion for injuries that are the result, either directly or indirectly, of a virus, means that your client is not covered by this insurance contract." The transcript of the hearing in this case may be found in the record of this case at ECF No. 48-3.

F. Supp.3d 299 (E.D. Va. 2021) (applying California law); <u>Fountain Enters., LLC v. Markel Ins. Co.</u>, No. 2:21v27, 2021 WL 4999447 (E.D. Va. Oct. 26, 2021) (applying Pennsylvania, Washington, and Mississippi law); <u>Adorn Barber & Beauty LLC v. Twin City Fire Ins. Co.</u>, No. 3:20CV418, 2021 WL 4851062 (E.D. Va. Oct. 18, 2021). In <u>Adorn Barber</u>, the court granted the insurer's motion to dismiss based on the plain language of an exclusion for "loss or damage caused directly or indirectly by the presence, growth, proliferation, spread or any activity of fungi, wet rot, dry rot, bacteria or virus." <u>Id.</u> at *2 (internal quotations omitted). While the court did not need to address the direct physical loss issue in applying the exclusion, it noted that a "growing body of federal courts have determined that 'physical loss' does not incorporate viruses." <u>Id.</u> at *8.

AGLIC relies on the ruling of the Circuit Court of Fairfax County in <u>Crescent Hotels & Resorts, LLC v. Zurich Am. Ins. Co.</u>, No. 2021-02974 (Fairfax County Cir. Ct. July 2, 2021) ECF No. 48-2, at 87, where the circuit judge sustained Zurich's demurrer to the hotel's COVID-19 insurance coverage claim, disagreeing that the presence of the virus created a physical loss or damage and finding that the contamination exclusion excludes virus claims.

Among the Virginia decisions, the decision in <u>Elegant Massage</u> stands alone. There the court found the claim for losses resulting from the SARS-CoV-2 virus plausible, likening the claim to those involving "asbestos, ammonia, odor from methamphetamine lab, or toxic gasses from drywall." 506 F.Supp.3d at 376. The court cited the following cases involving those sorts of substances:

- <u>TRAVCO Ins. Co. v. Ward</u>, 715 F. Supp.2d 699 (E.D. Va. 2010). <u>TRAVCO</u> concerned sulfuric gas released into a residence from defective drywall. In

distinguishing the cases cited by the insurer requiring a physical alteration or injury to the property's structure, the TRAVCO court found a "critical distinction" to be that "Defendant's home has been rendered uninhabitable by the toxic gases released by the Chinese Drywall." Id. at 709. The court added that "[w]hen read in the context of the precedent discussed above, this definition suggests that the parties intended to define 'direct physical loss' to include total loss of use. If [the insurance company] intended to define covered losses more narrowly, it should have done so more clearly." Id. at 709–10.

- Western Fire Ins. Co. v. First Presbyterian Church, 165 Colo. 34, 437 P.2d 52 (1968) (en banc). The fire department closed a "church building because of the the infiltration of gasoline in the soil under and around the building, which gasoline and vapors thereof infiltrated and contaminated the foundation and halls of the church building, making the same uninhabitable and making use of the building dangerous." 165 Colo. at 36–37, 437 P.2d at 54 (internal quotations omitted). Noting that "[i]t is perhaps quite true that the so-called 'loss of use' of the church premises, standing alone, does not in and of itself constitute a 'direct physical loss," 165 Colo. at 38, 437 P.2d at 55, "the accumulation of gasoline under and around the church built up to the point that there was such infiltration and contamination of the foundation, walls and rooms of the church building as to render it uninhabitable and make the continued use thereof dangerous." 165 Colo. at 39, 437 P.2d at 55. Because of the "infiltration and contamination of the very foundation, walls and rooms of the church building,"

23

165 Colo. at 39–40, 437 P.2d at 55, the court found coverage for "direct physical loss." 165 Colo. at 40, 437 P.2d at 55.

- Farmers Ins. Co. of Oregon v. Trutanich, 123 Or. App. 6, 858 P.2d 1332 (1993). Trutanich involved a claim under an all-risk homeowner's insurance policy for damages to remove the odor of a methamphetamine lab. Citing Western Fire v. First Presbyterian Church, the court concluded that "the odor produced by the methamphetamine lab had infiltrated the house. The cost of removing the odor is a direct physical loss." 123 Or. App. at 11, 858 P.2d at 1336.

- Murray v. State Farm Fire & Cas. Co., 203 W.Va. 477, 509 S.E.2d 1 (1998). In Murray, the fire department required three homes to be vacated following a rockslide. Several large rocks and boulders fell onto two of the homes, and the third was threatened. The court found coverage for direct physical loss under the all-risk homeowners' insurance policies as it was "clear that rocks and boulders could come crashing down at any time," rendering the homes "unusable or unhabitable," even in the "absence of structural damage to the insured property." 203 W.Va. at 493, 509 S.E.2d at 17.

- Port Authority v. Affiliated FM Ins. Co., 311 F.3d 226, 236 (3d Cir. 2002). In this asbestos contamination case, the Third Circuit affirmed the district court's conclusion that "physical loss or damage" "occurs only if an actual release of asbestos fibers from asbestos containing materials has resulted in the contamination of the property such that its function is nearly eliminated or destroyed, or the structure is made useless or uninhabitable, or if there exists an

24

imminent threat of the release of a quantity of asbestos fibers that would cause such loss of utility. The mere presence of asbestos, or the general threat of future damage from that presence, lacks the distinct and demonstrable character necessary for first-party insurance coverage." Id.

- Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am., No. 2:12-cv-04418, 2014 WL 6675934, at *6 (D.N.J. Nov. 25, 2014). Discharge of ammonia physically incapacitated a juice packaging facility, rendering it temporarily unfit for occupancy and use. The court found a "direct physical loss of or damage to" property as "the ammonia release physically transformed the air within Gregory Packaging's facility so that it contained an unsafe amount of ammonia or that the heightened ammonia levels rendered the facility unfit for occupancy until the ammonia could be dissipated." Id.

- Sentinel Mgmt. Co. v. N.H. Ins. Co., 563 N.W.2d 296, 300 (Minn. Ct. App. 1997). The court found a "direct physical loss" under an all-risk insurance policy from asbestos contamination, reasoning that "[a]lthough asbestos contamination does not result in tangible injury to the physical structure of a building, a building's function may be seriously impaired or destroyed and the property rendered useless by the presence of contaminants." Id.

- Homeowners Choice Prop. & Cas. v. Miguel Maspons, 211 So. 3d 1067, 1069 (Fla. 3d Dist. Ct. App. 2017). Failure of a drainpipe to perform its function constituted direct and physical loss to the property within the meaning of the policy.

25

The court does not find the comparison of the losses in these cases to loss of use of property as a result of COVID-19 to be apt. In each of the cases relied upon in Elegant Massage, the property insured by the policy suffered some infirmity that the court found to be a direct physical loss. Whether it be methamphetamine, gasoline, ammonia, or asbestos contamination, a rock fall or failed drainpipe, there was some physical loss associated with the insured property itself. Here, in contrast, Carilion Clinic claims no infirmity associated with its property. Rather, the claimed cause of loss is the global pandemic. As such, each of the cases relied upon by the court in Elegant Massage are distinguishable, and do not support a finding of coverage for direct physical loss stemming from spread of the SARS-CoV-2 virus.

Other courts have found this comparison lacking. For example, in Sandy Point Dental, the Seventh Circuit distinguished cases involving termite infestations, asbestos, and gases. After noting that courts have found termites and asbestos to cause a physical alteration to property, the Seventh Circuit found the gas infiltration cases to be "a little closer to the mark, but they too fall short." 20 F.4th at 334. Addressing directly the Western Fire v. First Presbyterian Church (gasoline vapors) and Gregory Packaging (ammonia) cases relied upon by the court in Elegant Massage[5], the court distinguished the loss there from those facing businesses impacted by COVID-19.

> But the gas infiltration in these cases led to more than a diminished ability to use the property. It was so severe that it led to complete dispossession—something easily characterized as a "direct physical loss." In all three cases, the courts concluded that the contamination made the premises "uninhabitable" and "unfit for normal human occupancy." In other words, the gas filtration

---

[5] The Seventh Circuit distinguished a third gas case not cited in Elegant Massage, Matzner v. Seaco Ins. Co., No. Civ. A. 98-0498-B, 1998 WL 566658, at *3 (Mass. Super. Ct. Aug. 12, 1998). Matzner concerned carbon monoxide contamination of an apartment building.

made physical entry impossible, thus barring all uses by all persons.

That distinguishes these cases from the three that are before us, where—at most—the Businesses' preferred use of the premises was partially limited, while other uses remained possible. Without any physical alteration to accompany it, this partial loss of use does not amount to a "direct physical loss." This is not to say that no circumstances can exist under which a loss of use, unaccompanied by any physical alteration to property, might be so pervasive as effectively to qualify as a complete physical dispossession of property and thus a "direct physical loss." The gas cases present one such scenario: where gas infiltration renders a property completely uninhabitable, it has been physically lost in a meaningful sense, even if only temporarily.

Id. (internal citations omitted). See Estes v. Cincinnati Ins. Co., 2022 WL 108606, at *4 (distinguishing heating oil odor case); 10012 Holdings, Inc. v. Sentinel Insurance Company, Ltd., 21 F.4th at 222 (distinguishing COVID-19 claim from cases involving "asbestos, odors, and noxious fumes, which physically damaged the insured's premises"); Kim-Chee LLC v. Phila. Indem. Ins. Co., 2022 WL 258569, at *2 ("[W]e agree with the district court that the virus's inability to physically alter or persistently contaminate property differentiates it from radiation, chemical dust, gas, asbestos, and other contaminants whose presence could trigger coverage under Kim-Chee's policy."); Santo's Italian Café LLC v. Acuity Ins. Co., 15 F.4th at 404–05 (distinguishing COVID-19 loss of use claim from cases such Western Fire v. First Presbyterian Church which "involved property that became practically useless for anything"); Northwell Health, Inc. v. Lexington Ins. Co., 2021 WL 3139991, at *5–*7(finding "flawed" the hospital system's argument that "[r]espiratory droplets carrying SARS-CoV-2 . . . are like the invisible fumes or noxious gas that courts have held can constitute a form of physical damage"). But see Regents of the Univ. of Colo. v. Factory Mut. Ins. Co., No. 2021CV 30206,

ECF No. 103-1, at 6–7 (Colo. Dist. Ct. Boulder Cnty, Jan. 26, 2022)(Guided by <u>Western Fire</u> <u>v. First Presbyterian Church</u>, the Colorado state court concluded: "The ambiguity in the phrase 'physical loss or damage' is enough to demonstrate that the present matter cannot be determined by the pleadings alone. However, because CU's complaint alleges both that COVID-19 prevented it from using its property and also that it altered the structure of the property by contaminating objects and lingering in the air, the Court finds that CU's pleadings plausibly allege that it was entitled to coverage under either interpretation of the phrase."). Consistent with these cases, the court does not find business losses due to the SARS-CoV-2 virus and the COVID-19 pandemic to be comparable to cases where property is rendered uninhabitable or unfit for any use by the presence of asbestos and noxious gases or fumes.

On balance, the court is persuaded by the uniform holdings of federal courts of appeals around the country that losses due to business interruption caused by the SARS-CoV-2 virus are not "direct physical loss of or damage" under the Zurich EDGE Healthcare Policy issued by AGLIC to Carilion Clinic. While the virus and COVID-19 have undoubtedly caused Carilion Clinic to suffer losses in terms of facility shutdown, reduction of medical procedures, and increased costs, the losses are not direct physical losses covered under the property insurance policy.

### C. Physical Loss or Damage — Time Element Coverage.

The conclusion reached that Carilion Clinic's losses stemming from the SARS-CoV-2 virus are not direct physical loss of or damage to property is reinforced by consideration of the Time Element coverage section of the policy. Section IV of the Zurich EDGE Policy provides that it "will pay for the actual Time Element loss the Insured sustains, as provided in

the Time Element Coverages, during the Period of Liability." Zurich EDGE Policy, ECF No.

43-1, § 4.01.01. The Time Element Coverages section of the Zurich EDGE Policy provides

that AGLIC will pay Gross Earnings loss, defined as "the actual loss sustained by the Insured

during the Period of Liability." Id. at § 4.02.01.01. Period of Liability is defined as follows:

> For building and equipment: The period starting from the time
> of physical loss or damage of the type insured against and ending
> when with due diligence and dispatch the building and equipment
> could be repaired or replaced, and made ready for operations
> under the same or equivalent physical and operating conditions
> that existed prior to the damage.

Id. at § 4.03.01.01. Thus, under the Zurich EDGE Policy, Carilion Clinic may recover for a

covered loss of gross earnings only up to the point where "with due diligence and reasonable

dispatch the building and equipment could be repaired or replaced." Id. While this limitation

makes sense in the case of structural damage to a building or a missing piece of equipment, it

does not square with a loss of use due to COVID-19 as there is no building or equipment that

must be repaired or replaced as a result of the pandemic.

Several other courts have referenced similar timing provisions in property insurance

policies to confirm that business interruptions caused by the COVID-19 pandemic are not

direct physical losses within the meaning of the policies. In Sandy Point Dental, the Seventh

Circuit considered a similar period of restoration clause to be a "textual clue[ ] that reinforce[s]

the conclusion that 'direct physical loss' requires a physical alteration to property. As

Cincinnati points out, the Policy provides coverage for losses sustained during a 'period of

restoration,' which is defined by reference to '[t]he date [by which] the property . . . should be

repaired, rebuilt, or replaced. Without a physical alteration to property, there would be nothing

to repair, rebuild or replace." 20 F.4th at 333. The Ninth Circuit in Mudpie, Inc. read similar

policy language the same way. "That this coverage extends only until covered property is repaired, rebuilt, or replaced, or the business moves to a new permanent location suggests the Policy contemplates providing coverage only if there are physical alterations to the property. To interpret the Policy to provide coverage absent physical damage would render the 'period of restoration' clause superfluous." 15 F. 4th at 892. The Tenth Circuit in Goodwill Industries reached the same conclusion. "After suspending business due to COVID restrictions, Goodwill had nothing to repair, rebuild, or replace before it could resume operations. Nothing 'physical' happened to its property—Goodwill simply had to wait until the government lifted the restrictions." 21 F.4th at 711. Although the Time Element clause in the Zurich EDGE Policy is worded slightly differently than the "period of restoration" clauses in the policies involved in these three cases, the concepts are the same and the same conclusion follows.

In short, as reflected in the uniform treatment of this question by federal courts of appeals from around the country, Carilion Clinic's losses due to the COVID-19 pandemic are not direct physical losses to its property covered under the Zurich EDGE Policy. Both the language of the Zurich EDGE Policy and the decisions of the eight federal circuits that have addressed this issue amply support this conclusion. Accordingly, AGLIC's motion to dismiss Carilion Clinic's claim for property damage and time element coverage is **GRANTED.**

## II.

Even if the court were to consider Carilion Clinic's COVID-19 losses to be a direct physical loss, the Zurich EDGE Policy unambiguously excludes coverage caused by virus contamination. Section 3.03.01.01. excludes "Contamination and any cost due to Contamination including the inability to use or occupy property or any cost of making

30

property safe or suitable for use or occupancy . . ." Contamination is defined as "Any condition of property due to the actual presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, Fungus, mold or mildew." Zurich EDGE Policy, ECF No. 43-1, at § 7.09.

Carilion Clinic argues that the court should not apply this clear exclusion for losses caused by virus contamination because of ambiguity created by an amendment to the policy entitled "Amendatory Endorsement – Louisiana." Zurich EDGE Policy, ECF 43-1, at 100–102. This endorsement shortens the definition of Contamination in § 7.09., replacing it with "[a]ny condition of property due to the actual presence of any Contaminant(s)." As the definition of Contaminant in § 7.10. does not include virus, the impact of this Amendatory Endorsement – Louisiana is to remove virus contamination from the scope of the exclusion. Although Carilion Clinic has no insured property in Louisiana, it argues that the Amendatory Endorsement – Louisiana applies to its Virginia properties for three reasons. First, Carilion Clinic notes the capitalized and bolded header which states "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY." Carilion Clinic also argues that, unlike the amendatory endorsements for Connecticut and New York,[6] the Amendatory Endorsement – Louisiana contains no language expressly limiting its application to Louisiana. Third, Carilion Clinic argues that the reference to Louisiana in the title of the endorsement does not affect its application to its properties in Virginia as § 6.20. of the Zurich EDGE

---

[6] Carilion Clinic notes that the New York and Connecticut Amendatory Endorsements have headers with different text, making it clear that the endorsement applies to risks in those states. Zurich EDGE Policy, ECF No. 43-1, at 77, 125.

Policy states "[t]he titles of the various paragraphs and endorsements are solely for reference and shall not in any way affect the provisions to which they relate."

The court does not find Carilion Clinic's argument persuasive. Reading the plain language of the "Amendatory Endorsement – Louisiana," that endorsement applies to Louisiana. To conclude otherwise would require the court to read Louisiana out of this endorsement. Also, it makes no sense to read the Amendatory Endorsement – Louisiana to apply to risks in other states as the language of the endorsements referencing individual states contains different, and sometimes conflicting language. The only way to make sense of all of the language of the Zurich EDGE Policy is to read the Amendatory Endorsement – Louisiana as applying to risks in Louisiana.

Several courts have weighed in on this issue, and the court finds those decisions limiting the Amendatory Endorsement – Louisiana to risks in Louisiana to be more persuasive. In AECOM v. Zurich Am. Ins. Co., the Central District of California rejected the insured's claim that the Amendatory Endorsement – Louisiana modified the contaminant exclusion so it no longer excludes damage caused by the SARS-CoV-2 virus in California. The court reasoned:

> Notwithstanding that the titles used cannot change the Policies, they may be used for reference and context in interpreting the Policies. Thus, the inclusion of a state in the title of an endorsement provides the context in which it should be construed. Of the 49 attachments to the Policies, 31 are "Amendatory Endorsements" that include the name of a specific state. These state-specific endorsements appear in alphabetical order in the table of contents as part of a list of the Policies' attachments. The inclusion of specific states in the titles and their inclusion in the table of contents result in the reasonable interpretation that each endorsement refers to a specific state. To adopt Plaintiff's argument and corresponding interpretation would mean that each of those endorsements would apply in every state rather than only in the one stated in the title. This

would lead to confusion given that the terms of the Amendatory
Endorsements as to certain states on certain terms are different
than those in the Amendatory Endorsements titled with the
names of other states. For example, the endorsements impose
conflicting limits on the time within which a legal action must be
brought under the Policies. See, e.g.,[Zurich EDGE Policy, ECF
No 43-1, at 76] (Alaska Endorsement providing three years to
bring an action); id. at [84] (Florida Endorsement providing five
years to do so: id. at [92] (Illinois providing 12 months to do so);
id. at [101] (Louisiana providing 24 months to do so).

AECOM v. Zurich Am. Ins. Co., 2021 WL 6425546, at *10 (internal citations omitted).

Reading the terms of the same Zurich EDGE Policy at issue here, the Central District of

California concluded that "these state-specific endorsements be given effect with respect to a

policy and the corresponding insured in a particular state," id., and held that "the

Contamination Exclusion applies and precludes coverage of any direct physical loss or damage

caused to Plaintiff's property by the COVID-19 virus." Id. at *11.

Other courts have agreed, rejecting the attempt to apply the change in the

Contamination Exclusion found in the Amendatory Endorsement – Louisiana to properties

located outside of Louisiana. See Manhattan Partners, LLC , v. AGLIC, No. 20-14342 (SDW)

(LDW), 2021 WL 1016113, at *2 n.3. (D.N.J. Mar. 17, 2021) ("This Court is unpersuaded by

Plaintiff's argument that the Contagion exclusion has been modified by an endorsement to the

Policy which removed the word 'virus' and, therefore, is inapplicable here. The endorsement

to which Plaintiffs refer is titled 'Amendatory Endorsement – Louisiana' and appears in a list

of state-specific endorsements. Had the parties intended to remove 'virus' from the

Contamination provision, they could have done so with a general endorsement that was not

limited to a single state."(internal citations omitted)); Boscov's Dept. Store, Inc. v. AGLIC,

No. 5:20-cv-03672-JMG, 2021 WL 2681591, at *9 (E.D. Pa. June 30, 2021) (applying as clear

and unambiguous the Contamination Exclusion in the Zurich EDGE Policy and rejecting argument that the definition of Contamination in the Amendatory Endorsement – Louisiana applies to the entire policy); Lindenwood Female Coll. v. Zurich Am. Ins. Co., No. 4:20CV1503 HEA, 2021 WL 5050065, at *6 (E.D. Mo. Nov. 1, 2021) ("This specific amendatory endorsement clearly only applies to property located in Louisiana, as the other Amendatory Endorsements only apply to the specifically referenced states."); NTT Data Int'l LLC v. Zurich Am. Ins. Co., No. 3:21-CV-890-S, 2022 WL 196533, at *7 (N.D. Tex. Jan. 21, 2022) (rejecting the insured's argument based on the Amendatory Endorsement – Louisiana, in the Zurich EDGE Policy, stating "[t]he endorsement clearly states its geographic limitation in the title, even if it does not do so in the text of the endorsement itself"); Valley Health Sys. Inc., v. Zurich Am. Ins. Co., No. BER-L-1907-21, 2021 WL 4958349, at *10 (N.J. Super. Ct. Oct. 12, 2021) ("Plaintiffs' strained reading of the Policy and the Louisiana Amendatory Endorsement is not a reasonable interpretation. Under Plaintiffs' theory, each of the 31 state-specific endorsements would alter the Policy regardless of the location of the insured property. Such a reading, however, would destroy the harmony of the Policy because many of the state-specific endorsements expressly conflict with each other. The Court would have to pick which of these conflicting state-specific endorsements to apply across the country, rendering the other terms meaningless. The Court can only give effect to each of the state-specific endorsements by confining each to its identified state as intended.")(internal citation omitted); Firebirds Int'l, LLC v. Zurich Am. Ins. Co., No. 2020-CH-030, 2021 WL 2007870, at *5–6 (Ill. Cir. Ct. Apr. 19, 2021) ("While an ordinary person would find the inclusion of the endorsement somewhat curious, such a person would also find the endorsement ultimately

meaningless due to Firebirds lack of insured properties in Louisiana. Despite including the endorsements, . . .Zurich elected not to change the 'Contamination' exclusion in the body of the policy. . . . [T]he Louisiana Amendatory Endorsement does not render the 'Contamination' exclusion ambiguous and inapplicable."); United States of Aritzia, Inc., v. Zurich Am. Ins. Co., No. 21 CH 1231, slip op. at 9, (Ill. Cir. Ct. Nov. 10, 2021) ("Plaintiff is essentially asking this court to delete the word 'Louisiana' from the clearly state-specific Louisiana Endorsement and apply that endorsement nationwide. Doing so would not only violate every principle of policy construction, it would create numerous conflicts within the Policy as the Policy contains a state-specific amendatory endorsement for thirty one states, all with different and often conflicting provisions. The court will not rewrite the Policy to find that Plaintiff is entitled to expressly excluded coverage.").

Carilion Clinic argues that reliance on Manhattan Partners and cases citing it is flawed because AGLIC "did not disclose the Titles Provisions to the courts," Carilion Clinic Br. in Opp'n, ECF No. 50, at 44, and that the Manhattan Partners court "retreated from its holding on the endorsement" in response to AGLIC's motion for reconsideration. Id. After the court granted AGLIC's motion to dismiss, Manhattan Partners filed a motion to reconsider, which the district court denied. In so doing, the court stated: "As to the consideration of Defendant's argument regarding the policy endorsement, the reference to that argument is set forth as an alternative basis for this Court's decision; even if that analysis were removed, dismissal of the Complaint was still warranted." Manhattan Partners, No. 20-14342 (SDW)(LDW), 2021 U.S. Dist. LEXIS 100010 (D.N.J. May 24, 2021). Carilion Clinic reads this line as validating its

argument that the Titles provision in the Zurich EDGE Policy renders the Contaminant Exclusion ambiguous, requiring denial of AGLIC's motion to dismiss.

In addition, Carilion Clinic cites to a few courts that have gone the other way, finding the elimination of the virus exclusion in the Amendatory Endorsement – Louisiana to create ambiguity sufficient to deny the motion to dismiss. See, e.g., Novant Health, 2021 WL 4340006, at *5 ("AGLIC asserts that the Amendatory endorsements contain terms contradicting each other and it would be nonsensical to apply all of these endorsements to all claims. But AGLIC does not explain why it included 74 pages of irrelevant and immaterial words in Novant's policy, for no reason apparent on the record. . . . AGLIC has the burden to show the exclusion applies. The Court is not ruling that the virus exclusion does not apply, but in view of the contradictory language in the Policy, AGLIC has not met its burden at this stage of the proceedings.") (internal citations omitted); Rincon Band of Luiseno Indians v. AGLIC, No. 2021.001-CL-RCTC, Hrg. Tr. at 41(Rincon Band of Luiseno Indians Tribal Court July 15, 2021) (denying motions to dismiss based on ambiguities "around the Louisiana exception").

On balance, the court concludes that the only plausible way to harmonize the various provisions of the Zurich EDGE Policy issued to Carilion Clinic is to read the Amendatory Endorsement – Louisiana as applying solely to property in Louisiana. While some courts did not expressly address Carilion Clinic's argument based on the Titles section of the policy, the Central District of California in AECOM v. Zurich Am. Ins. Co. addressed it head on and did so in a manner striving to give effect to the entirety of the policy. The court concluded that "Plaintiff has failed to demonstrate that its interpretation of the Louisiana Endorsement is

reasonable. Nor has it argued that any of its allegedly covered properties is located in Louisiana. The Endorsement does not apply to the Policies and does not affect the application of the Contamination Exclusion." ECF No. 100-1 at 11. The court agrees that the virus provision in the Contamination Exclusion applies to bar Carilion Clinic's losses attributable to the COVID-19 pandemic and that the Amendatory Endorsement – Louisiana plainly is limited to property located there.

## III.

Consideration of the direct physical loss and virus exclusion issues applicable to the property damage and time element coverage under the Zurich EDGE Policy does not end the case, however, because Carilion Clinic purchased Special Coverage that plainly applies to losses sustained as a result of the COVID-19 pandemic. Section 5.02.35. of the Zurich EDGE Policy provides coverage for Interruption By Communicable Disease,[7] as follows:

> The Company will pay for the actual Gross Earnings loss sustained by the Insured, as provided by this Policy, resulting from the necessary Suspension of the Insured's business activities at an Insured Location if the Suspension is caused by order of an authorized governmental agency enforcing any law or ordinance regulating communicable diseases and that such portions of the location are declared uninhabitable due to the spread of communicable disease, prohibiting access to those portions of the Location.

> The Policy also covers the reasonable and necessary cost incurred for the cleanup, removal and disposal of the actual not suspected presence of substances(s) causing the spread of such communicable disease and to restore the locations in a manner so as to satisfy such authorized governmental agency. . . .

---

[7] Whereas the limit of liability for the Property Damage and Time Element coverage is $1,300,000,000, Zurich EDGE Policy § 2.03.06, the Interruption By Communicable Disease coverage is limited to a 30 day period not to exceed $1,000,000. Id. at § 2.03.08.

> This Coverage will not apply to loss or damage that is payable
> under any other provision in this Policy.

AGLIC has not asserted that this coverage requires direct physical loss of or damage

to property or that the Contaminant Exclusion applies. Instead, AGLIC argues that Carilion

Clinic's claim is not ripe as it has not denied the claim for such coverage because it is waiting

for Carilion Clinic to produce documentation of its loss requested by AGLIC. Carilion Clinic

responds that any requested documents have been provided to AGLIC.

"[T]he ripeness doctrine originates in the 'case or controversy' constraint of Article

III." Edgar v. Haines, 2 F.4th 298, 311 (4th Cir. 2021) (citing South Carolina v. United States,

912 F.3d 720, 730 (4th Cir. 2019)). Ripeness is a question of subject matter jurisdiction as to

which Carilion Clinic bears the burden. Whether a claim is ripe requires evaluation of "both

the fitness of the issues for judicial decision and the hardship to the parties of withholding

court consideration." Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967).

"The doctrine of ripeness prevents judicial consideration of an issue until a controversy

is presented in a 'clean-cut and concrete form.'" Miller v. Brown, 462 F.3d 312, 318–19 (4th

Cir. 2006) (quoting Rescue Army v. Mun. Court of L.A., 331 U.S. 549, 584 (1947)). A claim is

unripe "if it rests upon contingent future events that may not occur as anticipated, or indeed

may not occur at all." Scoggins v. Lee's Crossing Homeowners Ass'n, 718 F.3d 262, 270 (4th

Cir. 2013) (quoting Texas v. United States, 523 U.S. 296, 300 (1998)).

The First Amended Complaint alleges that "[o]n or about March 18, 2020, Carilion

Clinic gave notice to AGLIC of its losses from the Coronavirus and COVID-19." ECF No.

43, at ¶ 262. Carilion Clinic alleges that AGLIC has not sent an adjuster to visit or inspect any

of its facilities and has not conducted any investigation beyond asking some superficial

38

questions and requesting an updated list of Carilion Clinic's impacted facilities. Id. at ¶¶ 262–263.

As alleged in the First Amended Complaint, "[o]n April 23, 2020, AGLIC issued a coverage letter reserving AGLIC's rights to deny coverage on various grounds and effectively denying the Carilion Clinic Claim insofar as AGLIC still has not agreed to provide the urgently needed coverage." Id. at ¶ 267. Section 6.13.05. of the Zurich EDGE Policy requires that suits against AGLIC be started "within (12) months of the date of direct physical loss or damage to Covered Property." Zurich EDGE Policy, ECF No. 43-1, at 55. AGLIC extended this deadline for 90 days. First Amended Complaint, ECF No 43, at ¶ 274.

Given the deadline imposed by the Zurich EDGE Policy to bring legal action and the unresolved status of Carilion Clinic's claim for Interruption By Communicable Disease coverage, Carilion Clinic's claim is ripe. Accordingly, AGLIC's motion to dismiss Carilion Clinic's claim for declaratory judgment and breach of contract as regards Carilion Clinic's claim for Interruption By Communicable Disease coverage is **DENIED**.

## IV.

In sum, Carilion Clinic's claims for losses stemming from the SARS-CoV-2 virus and COVID-19 do not fall within the property damage or time element provisions of the Zurich EDGE Policy providing coverage for direct physical losses of or damage to property. The court also finds that the Contamination Exclusion bars Carilion Clinic's property damage claim and is not rendered ambiguous by the change in that exclusion applicable to property located in Louisiana by means of the Amendatory Endorsement – Louisiana. AGLIC's motion to

dismiss Carilion Clinic's claim for declaratory judgment and breach of contract as regards property damage and time element coverage is **GRANTED**.

The controversy over Carilion Clinic's claim for Interruption By Communicable Disease coverage is ripe, and AGLIC's motion to dismiss Carilion Clinic's declaratory judgment and breach of contract claim for this coverage is **DENIED**.

An appropriate order will be entered.

Entered: February 4, 2022

Michael F. Urbanski
Chief United States District Judge